UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN FROST,                          )
                                     )
          Petitioner,                )
                                     )
     vs.                             )          Case No. 4:07CV01481 AGF
                                     )
MIKE KEMNA,                          )
                                     )
          Respondent.                )

**<u>MEMORANDUM AND ORDER</u>**

     This matter is before the Court on the petition of Missouri state prisoner, John

Frost, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was indicted

on four charges: first degree murder, first degree robbery, and two counts of armed

criminal action.  The charges arose from the murder of a taxi driver on January 25, 2000.

Frost pled not guilty to the charges, and on December 18, 2002, a jury convicted

Petitioner of all four charges.  He was thereafter sentenced to life imprisonment without

the possibility of parole, a 30-year term of imprisonment, life imprisonment, and an

additional 30-year term of imprisonment.  The convictions and sentences were affirmed

on direct appeal, and Petitioner was denied state postconviction relief.

     In the present action, Petitioner asserts that his constitutional rights were violated

in the following ways: (1) the trial court failed to call a mistrial when the prosecutor

elicited information beyond the nature, date, and place of each of Petitioner's prior

crimes and their resulting sentences; (2) defense counsel rendered ineffective assistance

of counsel by not objecting when the State cross-examined Petitioner about his false

statements that he and his sister planned an alleged future robbery, and by not objecting to the State's closing argument about the alleged future robbery; (3) defense counsel rendered ineffective assistance of counsel by not investigating Petitioner's mother and sister, and by not calling them as witnesses at trial; (4) defense counsel rendered ineffective assistance of counsel by not investigating and deposing Johnchez Smith and Mario Wilson prior to trial; (5) the State failed to disclose information to Petitioner that a homicide detective, when interviewing Charles Liston, indicated to Mr. Liston that Charity White was a suspect in the murder; and (6) additional discovery will likely show that Petitioner is innocent.

Respondent argues that habeas relief should be denied because the petition is barred by the statute of limitation; Petitioner's first, second, third, and fourth grounds for relief were reasonably adjudicated by the state courts; Petitioner's fifth ground for relief was procedurally defaulted in state court and is without merit; and Petitioner's sixth ground for relief has no merit because it is not supported by newly discovered evidence in light of which it is more likely than not that no reasonable juror would convict. For the reasons set forth below, habeas relief shall be denied.

I.     **BACKGROUND**

   A.     **Trial**

The State presented evidence that on January 25, 2000, Jason Hall, a cab driver, was shot in the head in the 3700 block of Iowa, in the City of St. Louis. The bullet entered the right side of Mr. Hall's head and exited the left side of his head, traveling through the brain stem, and killing Mr. Hall instantly. After the bullet exited Mr. Hall's

head, it ricocheted off the dash board and landed in the back floorboard of the cab.  The bullet was seized and determined to be a .38 caliber lead revolver bullet.

Petitioner went to Mario Wilson's house in the 3600 block of Iowa that same day.  When Petitioner arrived at the house, he asked Andrew Wise for a change of clothes, because Petitioner's clothes were dirty.  Wise gave him a change of clothes, and Petitioner ordered pizza.  Petitioner had a .38 caliber revolver with him and he asked Wise if he wanted to see a dead body.  Later that night, Mario Wilson took Petitioner home.  About a week later, Petitioner told Wise, Joseph Smittie, and Wilson that he killed Hall, the cab driver, because he wanted "to make sure he could still do something, to make sure he could still do something because he hadn't did it – nothing bad in a while."

In December of 2000, Wise and Wilson told the police that Petitioner had told them he killed the cab driver.  The FBI had a covert vehicle wired for audio surveillance, and the police arranged for Wilson and Johnchez Smith to meet with Petitioner in this vehicle.  While they were in the car, Petitioner talked about how he had killed the cab driver.  Petitioner stated that he asked the cab driver for change for a twenty dollar bill, and that the cab driver pulled out $1,200.  Petitioner stated that he shot Mr. Hall in the back of the head and watched as his head "swelled up as big as a beach ball."  Portions of this conversation were played for the jury at trial.  During a sidebar with the Judge, defense counsel stipulated with the State to have only those portions of the audiotape played at trial, so that the jury would not hear evidence of other crimes and uncharged conduct.

The defense theory was that Petitioner was innocent, that there was no physical evidence that tied Petitioner to the crime, and that Petitioner told his friends that he shot the cab driver to enhance his reputation on the streets. In support of his defense, Petitioner testified that he did not kill Hall. He stated that the only reason that he told his friends he did it was to help his reputation "on the streets."

On direct examination, defense counsel asked Petitioner about his statements, from the same taped conversation, that he and his mother had been shot. Petitioner testified that neither he nor his mother had ever been shot, and that the reason he said those things on the tape was "just reputation, just to sugarcoat it."

On cross-examination, the State elicited information from Petitioner regarding two felony charges to which Petitioner pled guilty in November 2000. The State asked Petitioner if both felony charges were for carrying a concealed weapon, to which Petitioner answered affirmatively. The State then asked Petitioner if on both occasions the weapons Petitioner had been carrying were .38 pistols. Defense counsel objected to this question and asked the Court for a mistrial on the basis that the prosecution had exceeded the scope of proper cross-examination of Petitioner regarding his prior convictions by asking him about the type of weapon he was carrying. The Court sustained defense counsel's objection, but denied the request for a mistrial. The Court then instructed the jury to disregard the last question.

The State then asked Petitioner if the voice on the taped statement was Petitioner's voice, to which Petitioner confirmed it was. The State then asked Petitioner if Petitioner's sister was in the courtroom, which Petitioner confirmed, and asked Petitioner

about his taped statement that he and his sister planned to commit a robbery.  On the tape, Petitioner spoke of going with his sister to rob a Popeye's by getting his sister to get the manager out so he could "put a few knocks on her head" and pump up his reputation. Petitioner testified that he would never have gone through with the robbery and had just been talking when he made that taped statement.

The State also asked Petitioner how he had known, in the taped conversation, that the murdered cab driver had been killed with a .38 caliber weapon, and Petitioner replied, "Everybody know, sir."  When asked whether everybody knew that the cab driver got shot with a .38, Petitioner replied, "I ain't say no .38.  Everybody know I had a .38 revolver, sir."

In closing arguments, defense counsel made reference to Petitioner's uncharged conduct, including Petitioner's statements that he had been shot and that his mother had been shot, when in fact they had not been shot, to demonstrate that Petitioner bragged about things that were untrue.  Later in closing arguments, the State made reference to the planned robbery, stating "He'll lie about committing a murder if it helps his reputation. He'll lie about all these other matters, involving his sister in a crime, about his mother being shot and him being shot, if it suits his purpose."

At the close of evidence and arguments of counsel, the jury found Petitioner guilty of murder in the first degree, robbery in the first degree, and two counts of armed criminal action.  Petitioner was sentenced to a term of life imprisonment without the possibility of probation or parol, thirty years for the robbery, life imprisonment for one

count of armed criminal action, and thirty years imprisonment for the other count of armed criminal action.  (Resp. Ex. 1.)

## B.    Direct Appeal

Petitioner raised one argument on direct appeal: that the trial court abused its discretion in failing to grant a mistrial when the prosecutor elicited on cross-examination of Petitioner that his two prior convictions for unlawful use of a weapon were for concealing .38 caliber pistols, the same caliber pistol that was used to kill the victim in this case.  The appellate court ruled that the claim of error was without merit and that no error of law appeared.  (Resp. Ex. 5.)

## C.    State Postconviction Proceedings

In his amended motion for state postconviction relief, Petitioner raised the six claims he now raises in his federal habeas petition.  Petitioner first raised the claim that defense counsel rendered ineffective assistance of counsel by not objecting to cross-examination questions directed at the Petitioner that asked about his taped statements that he and his mother had been shot and that he and his sister planned to commit a robbery, and by not objecting to the State's closing argument about the alleged robbery.[1] Petitioner argued that but for defense counsel's deficient performance on this matter, the jury would not have learned of this evidence, and Petitioner would have been acquitted of one or more counts.

---

[1]     In its opinion, the motion court noted that the State never asked a question on cross-examination about the statements on the tape about Petitioner and his mother being shot.  (Resp. Ex. 7 at 105)

Petitioner next asserted that defense counsel rendered ineffective assistance of counsel by not investigating, subpoenaing, and calling his mother and his sister as defense witnesses at trial. Petitioner argued that his mother and sister would have corroborated Petitioner's testimony that the evidence about him and his mother being shot, and the alleged future robbery involving him and his sister, was false, and that but for defense counsel's deficient performance on this matter, Petitioner would have been acquitted of the charged crimes.

Petitioner also asserted that defense counsel rendered ineffective assistance of counsel by not investigating and deposing Johnchez Smith and Mario Wilson. Petitioner argued that the depositions would have helped in defense counsel's preparation and would have put the jurors in a better position to determine Smith's and Wilson's credibility, and that but for defense counsel's deficient performance on this matter, Petitioner "would have had a significantly different impression of [defense counsel's] representation and his chances of acquittal before the trial."

As his final contention that trial counsel rendered ineffective assistance, Petitioner raised defense counsel's failure to object to the testimony of Phil Wasem, an unendorsed witness, and failure to object to the State's use of Exhibit 18, the audiotape, asserting that but for defense counsel's deficient performance on these matters, Petitioner would have been acquitted of the charged crimes.

Lastly, Petitioner raised the claim that appellate counsel rendered ineffective assistance by not briefing the issue of the trial court's error in allowing evidence of Petitioner's prior convictions, and that Petitioner was therefore prejudiced. (Resp. Ex. 7.)

At an evidentiary hearing on the postconviction motion held on June 10, 2005, defense counsel testified that he had been a criminal defense attorney for approximately ten years, and had tried approximately 40 to 45 felony trials during that period. He testified that as the trial approached, he met with the Petitioner regularly.

With regard to the tape recording, defense counsel testified that he had stipulated with the State that only small portions of the audiotape comprising the State's Exhibit 18 would be played at trial. He testified that he told the Court that he did not want the jury to hear the uncharged crimes that were on the tape, including statements that the Petitioner and his mother had been shot and that he and his sister were planning to rob a Popeye's Restaurant. Defense counsel testified that the Petitioner did not agree with him on how the tape should be played.

Defense counsel testified that he did not object to the State's cross-examination of Petitioner regarding Petitioner and Petitioner's mother being shot because part of his argument was that Petitioner bragged about things that were not necessarily true. He testified that he did not want the tape played on these matters, however, because he did not think the conversation about Petitioner planning a robbery would be good for the jury to hear, and would be highly prejudicial to Petitioner.

Defense counsel testified that he had spoken with Petitioner's mother about being a potential witness and she had told defense counsel that Petitioner was boasting and bragging a lot, and "made stuff up like that." He had spoken with Petitioner's mother several times, but he did not think it was necessary to call her as a witness because he felt that it was clear the Petitioner was not being truthful about himself and his mother being

shot, and he had what he needed to argue to the jury that Petitioner was boasting about those things. While Petitioner's mother's testimony would probably have corroborated Petitioner's testimony, at the time, defense counsel thought it was unnecessary. Looking back, he still would not have called her as a witness because no one disagreed with the fact that Petitioner and his mother had not been shot. His strategy was that Petitioner was boasting and that Petitioner's statements were false.

Defense counsel testified that his strategy for not playing the entire tape was that the other conversations on the tape were highly prejudicial to Petitioner, given the fact that he was charged with robbery and given the facts of the case. He did testify that he should have objected to the State's cross-examination of Petitioner regarding the robbery Petitioner and his sister were planning.

Defense counsel testified that he did not remember Petitioner telling him about Petitioner's sister. He testified that had he known about her, he probably would not have called her as a witness even if she would testify that she and Petitioner were not planning the robbery, for the same reasons he did not call Petitioner's mother as a witness.

With regard to Mario Wilson and Johnchez Smith, defense counsel testified that he knew that they were witnesses for the State, he had their contact information, and he had their police reports. He stated that he did not depose them prior to trial because he did not think it was necessary because he had statements from them as to what they would testify to at trial. In general, when making a decision whether or not to depose a witness prior to trial, he considers how complicated the fact matter of the case is, what the

witness's position is, and whether it is unclear what the witness's testimony is going to be at trial.

Defense counsel further testified that he had advised Petitioner not to testify at the trial and that any prior reported statement that Petitioner made in and around the time of the alleged crime would be the subject of cross-examination of Petitioner on his credibility. He testified that Mario Wilson and Johnchez Smith were also on the tape recording and he believed that taped conversation was going to be their expected testimony. He also believed that if their testimony had changed from what was on the tape, he could cross-examine them based on the contents of the tape. He testified that the State did not present any evidence to negate the allegations that Petitioner had made false statements about Petitioner and his mother being shot and the future robbery, and only cross-examined Petitioner on the stand about making false statements when it suited his purpose. Moreover, the State was not contesting the falsity of Petitioner's statements.

Petitioner's mother and sister also testified at the evidentiary hearing. Petitioner's mother testified that she had a prior conviction for possession of paraphernalia with PCP in it. She stated that she met with defense counsel one time prior to Petitioner's trial. She confirmed that she had never been shot, that Petitioner had never been shot, and that she had never heard her daughter or son talk of planning a robbery. She had told defense counsel that Petitioner was boasting and lying on the tape, and that she was willing to testify, but defense counsel told her there was no need for her to testify. She also testified that she would have paid for the depositions of Mario Wilson and Johnchez Smith on behalf of Petitioner.

Petitioner's sister testified that she had met defense counsel the day of trial. She, too, confirmed that Petitioner had not been shot and testified that she and Petitioner had never planned the robbery. She stated that she was not asked to testify at Petitioner's trial, but that she would have been willing to testify.

Petitioner was the last witness called to testify at the evidentiary hearing. He testified that he had been represented by Scott Rosenblum for approximately six months, and then defense counsel was "pushed on" him. He stated that he met with defense counsel twice before trial, for periods of no more than 15 minutes each time. He testified that defense counsel did not play the State's Exhibit 18 audiotape for Petitioner until the day of trial, that they talked about what portions of the tape were going to be played, and that he told defense counsel that he wanted all of the tape played, or nothing at all. Petitioner wanted all or nothing played because there were a lot of places on the tape where Petitioner said things that he had not actually done, and described things that had happened to him, about which his family had not testified.

Petitioner recalled boasting about being shot, and about his mother being shot, but testified that neither of them had ever actually been shot, and that his statements were therefore false. He remembered a portion of the tape where he discussed planning a robbery with his sister, but he did not actually plan to go through with a robbery, and therefore this statement was also false. He stated that he told defense counsel that he and his sister never planned a robbery. Petitioner testified that he recalled the State asking him about his falsely boasting about he and his mother being shot, and about he and his sister planning a robbery. He testified that defense counsel did not object to these

questions and that he had explained to defense counsel that he wanted the whole tape played, not a portion thereof, so that the jury could see that the entire tape was a lie.

Petitioner testified that he had specifically requested that defense counsel call his mother and sister as witnesses to testify to his innocence, adding that both were at the trial and were willing and able to testify on his behalf. He also testified that defense counsel had Wilson's and Smith's contact information, and that he had asked defense counsel to depose both Wilson and Smith prior to trial so they would be more accountable for their statements, but defense counsel did not contact the State about deposing either Wilson or Smith. Petitioner stated that Wilson and Smith "switched up on a lot of things[,]" "like about the clothes and all that." Petitioner stated that his mother would have paid for those depositions, had defense counsel requested them.

Petitioner testified that when it suited him, he knew how to lie. He testified that he was under the influence of alcohol and was boasting when he made the taped statements. He confirmed that he and defense counsel had disagreed about whether or not Petitioner should testify, and despite defense counsel's advice that he not testify, Petitioner chose to testify. He believed that had the whole tape been played, the jury would have believed him and found him not guilty. (Resp. Ex. 6.)

The motion court held that defense counsel was not ineffective for failing to object to cross-examination questions directed at the Petitioner regarding the taped statements that he and his mother had been shot and that he and his sister planned to commit a robbery, because admission of this evidence supported Petitioner's theory that the recorded statements were not credible because they included obviously false statements.

The motion court further held that defense counsel was not ineffective for failing to object to the references in the State's closing arguments to those same taped statements because the statements were already admitted into evidence, so there was no meritorious objection that could have been made to referring to them in closing arguments. The motion court further held that defense counsel was not ineffective for failing to investigate, subpoena, and call Petitioner's mother and sister because the testimony would have been cumulative of other evidence, and the falsity of Petitioner's statements that he and his mother had been shot and that he and his sister had planned a robbery were not at issue, and therefore, would not have provided a viable defense for Petitioner.

The motion court further held that defense counsel was not ineffective for failing to investigate and depose Smith because Smith did not testify at trial and Petitioner could therefore not be prejudiced by defense counsel's failing to prepare to impeach Smith. The motion court held that defense counsel was not ineffective for failing to investigate and depose Wilson because no evidence was presented at the evidentiary hearing as to what Wilson would have said differently had defense counsel deposed him prior to trial. The motion court further held that defense counsel was not ineffective for failing to object to the testimony of Wasem because the fact that his name was provided in the indictment in compliance with Rule 23.01(e) was a mitigating factor, and Wasem's testimony added nothing material to the case. As such, Petitioner could not be prejudiced by defense counsel's failure to object.

The motion court found that defense counsel was not ineffective for failing to object to the use of a portion of Exhibit 18, the audiotape in which Petitioner admitted to

killing Hall, and in which he boasted about he and his mother having been shot and planning a robbery with this sister. Such an objection would have been meritless because Petitioner's statement that he murdered Hall was admissible as a statement of a party. And Petitioner was not prejudiced because it was part of his trial strategy to argue that his statements on the tape were not credible. Finally, the motion court held that appellate counsel was not ineffective for failing to brief the issue of the trial court's alleged error in allowing evidence of Petitioner's prior convictions, because no error was committed as the prior convictions of witnesses are admissible. (Resp. Ex. 7.)

The Missouri Court of Appeals affirmed the denial of postconviction relief, noting that it found the claims of error to be without merit and that no errors of law appeared. (Resp. Ex. 10.)

## II. TIMELINESS OF PETITION

As an initial matter, Respondent asserts that the petition was not timely filed. Title 28 U.S.C. § 2244(d)(1)(A) provides for a one-year statute of limitations, which begins to run when the state court judgment becomes final either by the conclusion of direct review, or when the time for seeking such review expires, whichever is later.

Where a prisoner appeals his conviction, and following affirmance of his conviction does not file for rehearing or transfer with the Missouri Court of Appeals, the statute of limitations begins either fifteen days after the Missouri Court of Appeals issues its opinion or when the mandate is issued, whichever is later. Riddle v. Kemna, 523 F.3d 850, 856 (8th Cir. 2008) (en banc). The statute of limitations is tolled while state post-conviction proceedings are pending. Id. Where a petitioner appeals the denial of his

motion for post-conviction relief, the statute of limitations begins to run again when the Missouri Court of Appeals issues its mandate.  <u>Payne v. Kemna</u>, 441 F.3d 570, 572 (8th Cir. 2006).

Prior to its decision in <u>Riddle</u>, however, the United States Court of Appeals for the Eighth Circuit held that a judgment was final, for purposes of the statute of limitations under The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), at the conclusion of all direct criminal appeals in the state system, followed by the expiration of the ninety days for filing a petition for a writ of certiorari with the United States Supreme Court.  <u>Nichols v. Bowersox</u>, 172 F.3d 1068, 1072 (8th Cir. 1999) (en banc).  The <u>Nichols</u> opinion allowed Missouri prisoners to include the ninety-day period for filing a petition for writ of certiorari regardless of whether they had filed a motion to transfer with the Missouri Supreme Court.  <u>Id.</u>

In this case, petitioner filed his federal petition for writ of habeas corpus after <u>Nichols</u> was decided and before the <u>Riddle</u> decision.  In such cases, it may be appropriate to analyze the timeliness of the petition under both the old and new rules.  <u>See</u> <u>Shelton v. Purkett</u>, 563 F.3d 404, 407 (8th Cir. 2009).

Under <u>Nichols</u>, the statute of limitations did not begin to run before August 13, 2004, the date petitioner filed his motion for post-conviction relief in state court.  The limitations period was tolled until September 28, 2006, which is the date on which the Missouri Court of Appeals issued its mandate on the denial of his motion for post-conviction relief.  <u>Payne</u>, 441 F.3d at 572.  The limitations period then ran for 326 days,

until petitioner filed his federal petition for writ of habeas corpus on August 20, 2007. Therefore, under Nichols, the petition for writ of habeas corpus was timely filed.

Under Riddle, however, the statute of limitations began to run on May 17, 2004, the date on which the Missouri Court of Appeals issued its mandate on petitioner's direct appeal. 523 F.3d at 856. The statute of limitations ran for 88 days, until petitioner filed his pro se motion for post-conviction relief on August 13, 2004. The statute of limitations was tolled until September 28, 2006, the date on which the Missouri Court of Appeals issued its mandate on the denial of his motion for post-conviction relief. Payne, 441 F.3d at 572. The statute of limitations then ran for 326 days, until petitioner filed his federal petition for writ of habeas corpus on August 20, 2007. As a result, 414 days of non-tolled time had elapsed when petitioner filed the petition, and the petition is time-barred under Riddle.

Riddle controls the timeliness analysis in this case. See Shelton, 563 F.3d at 407. The Riddle court also acknowledged, however, that with regard to an equitable tolling argument, a change in circuit precedent would constitute an "extraordinary circumstance" that may serve to equitably toll AEDPA's statute of limitations, if a petitioner had otherwise been diligently pursuing his rights. Riddle, 523 F.3d at 857.

The burden of establishing grounds that warrant equitable tolling rests with the petitioner. See Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005). Petitioner argues that the statute of limitations should be tolled in this case because the abrogation of Nichols was an extraordinary circumstance that was not attributable to him, and he has diligently

pursued his rights by seeking direct review of his conviction, seeking postconviction relief, and retaining counsel to pursue a writ of habeas corpus in federal court.

The Court finds that Petitioner could not have anticipated the change in Circuit precedent caused by the Eighth Circuit's decision in <u>Riddle</u> which occurred while the statute of limitations on his habeas claim was running, and Petitioner appears to have diligently pursued his claim. Accordingly, Petitioner is entitled to equitable tolling. <u>See</u> <u>Shelton</u>, 563 F.3d at 407 (change in circuit precedent is an extraordinary circumstance that would permit equitable tolling for a petitioner who had otherwise been diligently pursuing his rights).

Regardless of whether this action is time-barred, however, the Court will address the merits of the petition.

## III. MERITS ANALYSIS

### A. Standard of Review

"In the habeas setting, a federal court is bound by the AEDPA to exercise only limited and deferential review of underlying state court decisions." <u>Lomholt v. Iowa</u>, 327 F.3d 748, 751 (8th Cir. 2003). Under this standard, a federal court may not grant relief to a state prisoner unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)&(2).

A state court decision is contrary to clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or . . . decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407-08. "'Finally, a state court decision involves an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record.'" Ryan v. Clarke, 387 F.3d 785, 790 (8th Cir. 2004) (citations omitted).

**B.     Ground One - Failure to Call a Mistrial**

In his first ground for relief, Petitioner claims that he was denied his right to due process, right to a fair trial, and right to remain silent because the State engaged in impermissible questioning regarding whether Petitioner's two felony charges involved .38 caliber pistols and the trial court failed to remedy the issue by calling a mistrial. Specifically, Petitioner argues that Missouri law only allows the State to elicit the nature, date, and place of each prior crime and the resulting sentence, and that the State went beyond the allowed scope by asking whether Petitioner's prior charges involved .38 caliber pistols.

It is not within a federal habeas court's province "to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is

limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991).  Only evidentiary rulings that are "so grossly prejudicial that they fatally infect the entire trial, preventing it from being fundamentally fair, will justify habeas corpus relief." Henderson v. Norris, 118 F.3d 1283, 1286 (8th Cir. 1997); see also Weston v. Dormire, 272 F.3d 1109, 1113 (8th Cir. 2001).  "To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial-- i.e., that absent the alleged impropriety the verdict probably would have been different." Gee v. Groose, 110 F.3d 1346, 1350 (8th Cir. 1997) (en banc); see also Bounds v. Delo, 151 F.3d 1116, 1119 (8th Cir. 1998).

The Court does not believe that manifest injustice resulted from this alleged error. The trial court sustained the objection to the question and directed the jury to disregard the question.  Further, in Petitioner's own later testimony, when asked how he had known that the cab driver had been killed with a .38 caliber weapon, Petitioner volunteered that "Everybody know I had a .38 revolver, sir."  Moreover, the jury was played a taped conversation in which Petitioner admitted shooting the cab driver in the head, and on cross-examination, Petitioner acknowledged that it was his voice on the tape making that statement.  Even without the question regarding whether his past two felony charges involved .38 caliber pistols, Petitioner's possession of a .38 caliber pistol was essentially before the jury.  As a result, the Court finds that petitioner is not entitled to relief on Ground One of the petition.

## C.     Ineffective Assistance of Counsel

Petitioner's second, third, and fourth grounds for relief are based on alleged ineffective assistance of counsel. The Sixth Amendment guarantees a criminal defendant the right to effective assistance of trial counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To succeed on a claim of ineffective assistance of trial counsel on direct appeal, a defendant must establish both "that counsel's representation fell below an objective standard of reasonableness," and that but for counsel's deficiency there is "a reasonable probability" that the result of the trial would have been different. Id. at 688, 694. When the issue involves a matter of trial strategy, there is a strong presumption that the strategy was sound and does not amount to ineffective assistance. Bell v. Cone, 535 U.S. 685, 698 (2002); Williams v. Bowersox, 340 F.3d 667, 669 (8th Cir. 2003).

To prevail on an ineffective assistance of counsel claim in a § 2254 petition, a petitioner "'must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner.'" Underdahl v. Carlson, 381 F.3d 740, 742 (8th Cir. 2004) (quoting Bell v. Cone, 535 U.S. 685, 698-99 (2002)).

**1.      Ground Two - Failure to Object to Evidence of Petitioner's False Statements**

Petitioner claims that defense counsel rendered ineffective assistance of counsel by not objecting when the State cross-examined Petitioner about his false statements that he and his sister planned an alleged future robbery, and by not objecting to the State's closing argument about the alleged future robbery.

The motion court applied the Strickland standard in rejecting this claim, holding that defense counsel was not ineffective for failing to object to the State's cross-examination of Petitioner because Petitioner's direct testimony opened the door to this cross-examination, and the admission of this evidence supported Petitioner's theory that the recorded statements were not credible because they included obviously false statements. The motion court further held that defense counsel was not ineffective for failing to object to the references in the State's closing arguments to those same taped statements because the statements were already admitted into evidence. As such, there was no meritorious objection that could have been made to referring to them in closing arguments. The Missouri Court of Appeals affirmed the motion court's ruling.

The state courts did not apply Strickland to the facts of this case in an objectively unreasonable manner. The motion court properly examined the issue of prejudice against the backdrop of the evidence that had been presented against petitioner and reasonably concluded that petitioner had failed to demonstrate Strickland prejudice. As a result, the Court finds that Petitioner is not entitled to relief on Ground Two of the petition.

### 2. Ground Three - Failure to Investigate and Call Petitioner's Mother and Sister as Witnesses

Petitioner claims that defense counsel rendered ineffective assistance by not investigating Petitioner's mother and sister, and by not calling them as witnesses at trial. The motion court rejected this claim, noting that the testimony would have been cumulative of other evidence and did not bear on whether or not Petitioner committed the murder, but rather dealt with other events he discussed on the tape.

Again, this Court finds that the state courts did not apply <u>Strickland</u> to the facts of this case in an objectively unreasonable manner. It was reasonable to conclude that defense counsel's conduct did not fall below an objective standard of reasonableness, and that the decision not to investigate and call these witnesses did not create "a reasonable probability" that the result of the trial would have been different. As a result, the Court finds that petitioner is not entitled to relief on Ground Three of the petition.

### 3. Ground Four - Failure to Investigate and Depose Johnchez Smith and Mario Wilson

Petitioner claims that defense counsel rendered ineffective assistance by not investigating and deposing Smith and Wilson prior to trial. The motion court rejected this claim, noting that Smith did not testify at trial and Petitioner therefore could not be prejudiced by defense counsel's failing to prepare properly to impeach Smith. The motion court further held that defense counsel was not ineffective for failing to investigate and depose Wilson because no evidence was presented at the evidentiary hearing as to what Wilson would have said differently had defense counsel deposed him prior to trial.

This application of <u>Strickland</u> to the facts of this case was not objectively unreasonable. As noted by the motion court, Smith did not testify at trial and Petitioner could therefore not be prejudiced by defense counsel's failing to prepare properly to impeach him. Further, Petitioner did not plead or prove how defense counsel's failure to investigate or depose Wilson prejudiced Petitioner, or caused the result of the trial to be different. Petitioner's only testimony in support of his claim was that Mr. Wilson "switched up on a lot of things[,]" "like about the clothes and all that." At trial, Wilson testified consistently with the evidence on the tape recording, which contained Petitioner's audiotaped confession. As a result, the Court finds that Petitioner is not entitled to relief on Ground Four of the petition.

### D.    Ground Five - State's Failure to Disclose Exculpatory Evidence

Petitioner's fifth ground for relief claims that the State failed to disclose information to Petitioner that when interviewing Charles Liston, an inmate at the St. Louis Medium Security Institution, a homicide detective indicated that Charity White was a suspect in the murder. It is well established that "[t]he government's failure to disclose evidence that is material to the issue of guilt and is exculpatory in nature violates a defendant's right to due process." <u>United States v. Jones</u>, 160 F.3d 473, 479 (8th Cir. 1998) (citing <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)).

Claims that have not been fairly presented to the state courts are procedurally defaulted and may not give rise to federal habeas relief unless Petitioner shows "cause for not presenting the claim on post-conviction appeal, and prejudice from the failure, or a fundamental miscarriage of justice-meaning that he is actually innocent." <u>Storey v.</u>

Roper, 603 F.3d 507, 523 (2010) (citing Coleman v. Thompson, 501 U.S. 722, 748, 750 (1991); Schlup v. Delo, 513 U.S. 298, (1995)).  To show a fundamental miscarriage of justice, a petitioner must present new reliable evidence that he was innocent of the crime of which he was convicted.  Id. at 524 (citing House v. Bell, 547 U.S. 518, 537 (2006)).

A Missouri inmate procedurally defaults claims which should have been, but were not, presented on direct appeal or on appeal from the denial of a motion for post-conviction relief.  Moore-El v. Luebbers, 446 F.3d 890, 897-98 (8th Cir. 2006).  "A claim has been fairly presented when a petitioner has properly raised the same factual grounds and legal theories in the state courts that he is attempting to raise in his federal petition."  Wemark v. Iowa, 322 F.3d 1018, 1021 (8th Cir. 200).

Here, Petitioner did not present Ground Five to the Missouri Court of Appeals on appeal from the denial of his Rule 29.15 motion.  Petitioner argues that he can demonstrate both cause and prejudice for his default, as he asserts that his Brady claim did not come to light until after he had completed his state court postconviction proceedings.  Petitioner claims that he learned that the police had questioned Charles Liston and implicated Charity White in the murder of Hall while Petitioner was confined with Liston at Crossroad Correctional Center, a year before filing his federal habeas petition.  Petitioner attached the June 30, 2008 Affidavit of Liston to his Reply to State's Response to Claims Five and Six (Doc. # 36), in which Liston testified that:

> On or about 2000 of February two Detective arrived at the medium security institution and interviewed me regarding a Charity White being a suspect in a cab driver homicide in the City of St. Louis South Side.  After their request asking me of her where abouts I then removed myself from the interview.

Petitioner also states that this evidence was not disclosed to him at any time during his state court trial proceedings.

Petitioner also argues that he was prejudiced by the State's failure to disclose this evidence because evidence that the police were investigating individuals other than Petitioner would have been favorable to Petitioner, defense counsel could have used the evidence to impeach portions of Wilson's testimony, and this evidence might have uncovered other evidence "that other suspects used .38 caliber weapons when committing crimes."

Notwithstanding Petitioner's arguments, the Court finds that Petitioner has failed to establish "prejudice." Evidence that a police detective considered another suspect during his investigation of the crime does not negate the evidence of Petitioner's guilt put on at trial, including Petitioner's own admission of guilt. Therefore, the Court finds that there is no reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. See U.S. v. Bagley, 473 U.S. 667, 682 (1985) (holding that evidence favorable to the accused is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.").

As a result, the Court finds that Petitioner is not entitled to relief on Ground Five of the petition.

**E.      Ground Six - Additional Discovery Regarding Actual Innocence of Convictions**

Petitioner claims that additional discovery will likely show that Petitioner is actually innocent.  Specifically, he claims that additional discovery will likely disclose that Wilson cooperated with the law enforcement to avoid prosecution and that he now recants his testimony, and that additional fact finding will disclose that another suspect was the target of the investigation until she confessed to other crimes.

Petitioner acknowledges that there is no such thing as a free-standing claim of actual innocence in this Circuit, and instead alleges a "gateway claim" of actual innocence.  The "'actual innocence' gateway through a procedural bar is not intended to provide a petitioner with a new trial, with all the attendant development of evidence, in hopes of a different result.  Rather it is an opportunity for a petitioner, aggrieved by an allegedly defective trial and having inexcusably defaulted the available remedies, to raise such a strong doubt to his guilt that, in hindsight, we cannot have confidence in the trial's outcome."  Weeks v. Bowersox, 119 F.3d 1342, 1354 (8th Cir. 1997).

A petitioner's burden at the gateway stage of an actual innocence claim is "to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt - or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."  House v. Bell, 547 U.S. 518, 538 (2006).  Here, Petitioner has not presented the Court with any "new evidence" that Wilson cooperated with the law enforcement to avoid prosecution and that he now recants his testimony.  Rather, he has made mere allegations that additional

discovery would uncover such new evidence. Moreover, the only "new evidence" that Petitioner has presented to the Court regarding his allegation that another suspect was the target of the investigation until she confessed to other crimes is Liston's affidavit. As discussed more fully above, the Court finds that this affidavit does not make it more likely than not that any reasonable juror would have had reasonable doubt during Petitioner's trial, such that the result of the proceeding would have been different.

As a result, the Court finds that Petitioner is not entitled to relief on Ground Six of the petition.

## CONCLUSION

The Court concludes that Petitioner is not entitled to federal habeas relief. Furthermore, the Court does not believe that reasonable jurists might find the Court's assessment of the procedural or substantive issues presented in this case debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. §2253. See Miller-El v. Cockrell, 537 U.S. 322, 337 (2003) (standard for issuing a Certificate of Appealability) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

Accordingly,

**IT IS HEREBY ORDERED** that the petition of John Frost for a writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability shall not issue in this case.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of September, 2010.